JN Contemporary Art LLC v. Phillips Auctioneers LLC The appellate is remote. In dismissing JN's complaint, the lower court ignored Phillips' breaches of the Stengel Agreement by unilaterally rescheduling the evening auction without obtaining JN's consent. The lower court made an improper factual determination that the evening auction could be conducted only in May 2020, despite the Stengel Agreement expressly granting Phillips the right to offer the Stengel for sale post-May 2020. The lower court made an improper... Was that a factual determination or was that interpreting the contract? Your Honor, the contract is very clear in paragraph 6A1 that Phillips has the right to reschedule the evening auction to a date after May 2020, as long as JN's prior written consent is obtained. And also pursuant to paragraph 6A, the evening auction is described as, quote, currently scheduled for May 2020. They didn't have to make a consent, did they? No, they did not, Your Honor. And we maintain that they twice breached the Stengel Agreement by failing to ask for our consent and unilaterally rescheduling the date of the evening auction. And as a result of these two breaches, they cannot then attempt to enforce other provisions of the agreement against the non-breaching part of JN. The lower court also made an improper determination that the evening auction must be conducted physically in New York, despite the fact that the Stengel Agreement never required the Stengel to be offered for sale at a specific location or place or address, at a physical brick-and-mortar location in New York or exclusively in New York. The lower court also ignored the best evidence of the party's intent as to why the contract referred to the major spring 2020 evening auction in New York. I mean, doesn't that clearly specify that it's at the semi-annual in-person auction that takes place in New York City? I have three responses to that, Your Honor. The first is that a literal reading of that first sentence of paragraph 6A supports JN and not Phillips because it requires that the Stengel be offered for sale in New York and a virtual auction that makes the Stengel available for bidding by collectors in New York and other jurisdictions satisfies 6A. In the major spring 2020 evening auction? I mean, that's pretty specific. Right, and Your Honor, I believe that the exact meaning of that phrase, which again is, in our major spring 2020 evening auction of 20th century and contemporary art, is best elucidated by Phillips' public announcement on March 14, 2020. This is in A219 through A223 of the record, where Phillips declared that it was postponing auctions, and it included the spring 2020 updated calendar concerning auctions in June, July, and September, not auctions in spring. And one of the entries read, London and New York 20th century and contemporary art evening sales to be consolidated into one New York auction. And then Phillips' auction schedule, which is found in Phillips' July 2, 2020 evening auction catalog. The first entry in the column titled New York also reads July 2, 20th century and contemporary art, postponed from May 14 and 15, New York, and June 24, London. What these documents make clear is the intent of the parties at the time of contract formation and how Phillips construes offering an end. Does any of this matter if you're wrong about the force majeure clause? Yes, your honor. I think this is absolutely critical because as long as the Stengel Agreement does not expressly constrain performance to one very specific or narrow type of performance, like in cases cited by Phillips where you have to deliver wood from a certain parcel of land and then that parcel burns down, where performance isn't so narrowly constrained, you need to attempt alternative performance. Why is that so given? I'm sorry. Why is that so given the force majeure clause? If there are conditions outside Phillips' control that preclude the auction on its original stated date, why weren't they entitled to terminate under Section 12? Isn't that what the district court concluded Section 12 meant? They did conclude that, your honor, but I would argue that it was errored for a couple reasons. One of the reasons is that performance was not so narrowly constrained in the argument and a virtual auction with an auctioneer physically in London but live streamed into New York and as Phillips described in their own documents, this was in fact the Spring 2020 evening virtual auction of contemporary and 20th century art, that that satisfies the requirement of 6A. I think I may be missing something in your argument. Section 6 contemplates, I think, a discretionary rescheduling, not a mandatory one. So if Section 12 applies, I'm not sure why your adversary was required to consider these other options you're speaking about. Help me out. Yes, your honor. Thank you for framing it that way because that is one of our most important arguments. This distinction between discretionary and mandatory rescheduling that Phillips created out of whole cloth and that the lower court accepted is a false distinction. Nowhere in the contract are the terms discretionary or mandatory. 6A applies only to rescheduling. 12A applies only to postponement and then subsequently the right to terminate as a result of that postponement. So pursuant to 6A, if Phillips was rescheduling because they wanted to or because they felt they had to, they still needed to obtain Jan's written consent and they never sought or obtained it. Whereas, again, in paragraph 12A, it says, in the event that the auction is postponed. I just want to make clear. Well, there was no postponement. That's part of your complaint, isn't it, that they should have postponed it? Because, in fact, they never did. And that's what I understand your adversary to be saying is that they didn't auction the painting after May 2020 and so they never required your consent. And you say that's not so. Our argument, Your Honor, is that when they first rescheduled the evening auction to June 24th to 25th, they never sought or obtained their consent. Also, at that time, they did not terminate the agreement. What they did is they rescheduled and they did that unilaterally. All right, but let me be sure I understand. Yes. When they rescheduled without your consent, the contract therefore obligated them to auction in May 2020 because they hadn't obtained your consent to something else. But they're saying May 2020 was impossible for the reasons supported by the force majeure clause. And in light of that, they didn't have to postpone, get consent, or anything. I need to know why you think that should not persuade us. Your Honor, if I understand your question, my response would be that because when they unilaterally rescheduled the argument, they did so without obtaining our consent. All right, and so what's the consequence of that? I thought the consequence was that therefore they were obliged to auction in May The consequence at that point, Your Honor, is that they're in breach of the agreement. And so then they cannot try to use any other provision in the contract against Jan as the non-breach part of it. No, they wouldn't have been in breach if they had auctioned your painting in May because they wouldn't have needed. There would have been no extension. The problem for you is that the breach never came into play according to your argument, Your Honor. The breach was necessary because they invoked the force majeure clause. But, Your Honor, they did not invoke the force majeure clause at the time that they rescheduled the evening auction. In fact, they didn't invoke it both times. They rescheduled unilaterally. They only did that 89 days later. So they did not actually try to invoke 12A until 89 days after rescheduling and postponing the evening auction. Counsel, you argue that the two contracts were mutually dependent. Is that correct? Yes, it is, Your Honor. And isn't that a question of fact? Yes, Your Honor. I think it very much is a question of fact, especially in a case like this where both contracts were negotiated at the same time, in the same place, by the same parties. They have the same effective dates. One contract expressly refers to the other and conditions that contract on one of the parties signing the other contract. I think a factual inquiry was absolutely critical. Why? Why wouldn't we just look to the contract and see whether or not they were interdependent? Why is it a question of fact rather than a question of contract interpretation? Well, I think they are interdependent under both readings, Your Honor, in that one contract expressly referenced the others. But insofar as the court isn't swayed just by that alone, then I would maintain that the court should have conducted a factual inquiry of the circumstances, the parties' negotiations and execution of those agreements, which would have made clear that they were part of one unified transaction, one trade, whereby one party guaranteed the Stengel and the other party guaranteed the Basquiat. Well, I'm not sure I understand, then, what error you're attributing to the district court. If the district court decided they were not interdependent by construing the contract, which is what I thought the court did, then you have to argue that that was error because it is in – because she either misconstrued the contract or it could have been decided as a matter of contract. It had factual questions. What's your argument? That it was an error in construing the contract or that it couldn't be construed according to the contract? Primarily the latter, Your Honor, that it couldn't be construed just based on the language of the contract alone. And therefore it was a question of fact.  If there was no breach of the Stengel contract, does all of this become irrelevant? The integration with the Basquiat contract? I mean, your argument about the Basquiat contract is dependent on there being a breach of the Stengel contract, or am I mistaken? That's fair, Your Honor. I think it provides more context and shows just how badly Jan was hoodwinked by Phillips insofar as they fully performed under the Basquiat. But, yes, I believe that we could prevail solely based on breach of the Stengel agreement without even deciding any issues related to the Basquiat agreement. Indeed, my suggestion to you was that you could only succeed by showing a Stengel breach, not that that was alternatively ground. Am I correct that your argument is there's the Stengel breach and that there's the Basquiat contract because they're integrated? My response to that, Your Honor, is I think there could also be an independent breach of the Basquiat agreement insofar as the introductory paragraph of the Basquiat agreement states, conditional upon signature by you of the consignment agreement with guarantee of minimum price in respect to the work by Rudolf Stengel, entitled 2009, and so on. I believe that the requirement imposed by that introductory paragraph was not simply signing the Stengel agreement, but also performing under the Stengel agreement. So, insofar... So, these are questions of fact decided on a 12D6 motion. Isn't that correct? Absolutely, Your Honor. Yes, that is our position. Well, your time has long expired, but the questions were good. You've reserved three minutes for rebuttal. We'll hear from J&M. Thank you, Your Honor. Thank you. Good morning. May I please report? My name is Luke Nickus. I'm 20 manual. I'm here with my partner, Maren Shaw, on behalf of Phillips Auctioneers. Oh, Phillips. Sorry. The consignment agreement in this case permitted Phillips to terminate the agreement. If the auction of the consigned work, the Stengel work, is postponed for reasons beyond its control or J&M's control, including but not limited to a natural disaster. But you could have gotten consent to postpone it. Could you have not? Judge, the question relates to the interplay between Section 6A and Section 12A of the Stengel agreement.  Phillips has discretion, specifically uses that word, 6A, to move the auction date beyond May 2020 only with the consent of J&M. But when you look to Section 12A, what Section 12A says is that if the auction is postponed beyond the circumstances or beyond control or reasons outside the control of both parties, then Phillips has the right to terminate. And so the 6A provision applies specifically when Phillips exercises discretion, when it wants to move the date. And Section 12A is a classic post-mortem provision that applies when the auction is postponed for reasons outside its control, outside its discretion. And, Judge, we should also note that Section 12A specifically references not just reasons beyond Phillips' control, but also J&M's control, like COVID-19, a natural disaster. If J&M had the control over whether an auction could be postponed or not by giving or withholding its consent, then Section 12A would be illusory, because J&M would always withhold its consent, and therefore Phillips could never postpone, even if it were a natural disaster. And Judge Koch and the district court looked at the plain language of those two provisions and said 6A applies only when Phillips is exercising its discretion and by the express words in 6A. And 12A applies when it's not. And so what Phillips did was Phillips postponed the auction for reasons outside of its control or J&M's control, and that was COVID-19, a natural disaster. Is it clear that a pandemic is a natural disaster? You think of a natural disaster, you think of a hurricane, an earthquake, et cetera, and here there are also theories that maybe this was man-made, and so what are your thoughts on that issue? And Judge Koch did precisely that. She looked at the Oxford English Dictionary. She looked at Black's Law Dictionary. And when you look at the definitions of natural disaster, the phrase natural disaster, what you see is that a natural disaster is a natural event that brings about great loss of property or human life. And multiple courts, that's exactly what COVID did and continues to do, multiple courts, Southern District of Texas, the Pennsylvania Supreme Court, State Court, have found that COVID is a natural disaster. And if you look back to the court's decisions in this court and across the country, to look to see how courts have used the phrase natural disaster, what you see is that courts consider pandemics like this one to be natural disasters. And this worked badly in the case, for example. The court says natural disaster. If the prison were to shut down because of a natural disaster, prison conditions, then like fire or viral epidemic, the Texas Circuit said the same exact thing. The D.C. Circuit has said the same exact thing. The ordinary way in which courts have used the phrase natural disaster, they have used it in the context of pandemics and epidemics. And I gather your argument is that even assuming, even assuming a pandemic is not a natural disaster, the prior language, circumstances beyond our control, would cover a pandemic in any event. It would, Your Honor. Because COVID-19 certainly is- Was it beyond the control of the parties? Precisely. And when you look to the language, this is where J.N. argues, we need to use principles of contractual interpretation. Let's use the enumerated items in Section 12A to narrow the meaning of beyond circumstances beyond our control. Counsel, you could have rescheduled the auction of the Stengel painting for the June auction which took place. Was it in London? The auction was rescheduled. It was postponed within the meeting of Section 12A. And once the auction was postponed, 12A does not require any further inquiry into whether Phillips is permitted to terminate. It says- I'm sorry. I didn't catch the last thing you said. Sometimes the masks muzzle us a little. It didn't require any further inquiry, and then I missed what you said. Sure. Once the auction was postponed for circumstances outside of Phillips and J.N.'s control, 12A expressly says that Phillips may terminate. Period. Full stop. So once the postponement occurred for reasons outside the control, Phillips has the right to terminate, and that's exactly what it did. Within the plain language of Section 12A. Now, J.N. also argues, look to the Basquiat agreement. There was an exchange of your honor at the end of the colloquy. Well, let's look at the Basquiat agreement, and I'll get to whether you should or not, but let's look now. Let's pretend for just a moment it was one part of a unified transaction. You need to interpret the language of both of them. Then look at the plain language. Let's do it step by step. What does the Basquiat agreement say? The Basquiat agreement says that J.N. will make an irrevocable bid on the Basquiat in the 20th century evening auction in London, which by the way is conducted in London. It says that in exchange for that, one of the conditions is that J.N. will sign the singular agreement. It doesn't say in the Basquiat agreement that Phillips has to do anything else with respect to the singular. It specifically says in the plain language J.N. has to sign the agreement. So then let's take a step over and look at the singular agreement. What does the singular agreement say? The singular agreement says that if the auction is postponed for reasons outside of J.N. for Phillips control, including for reasons such as natural disaster, then Phillips can terminate. That's exactly what it did. There is nothing in the Basquiat agreement that says Phillips wasn't allowed to do that. There is nothing in the Basquiat agreement that's inconsistent with Phillips' express rights under the singular agreement. There is nothing in the Basquiat agreement that says when J.N. signs the singular agreement and agrees to Section 12a in the singular agreement, you should ignore that section. There is nothing inconsistent between the agreements themselves. And so there was no factual inquiry to conduct because the agreements on the plain language of the relevant provisions allowed Phillips to terminate because the auction was postponed for reasons beyond its control. And so when you look at the plain language of both agreements, Phillips was permitted to terminate. And to get back to your question about whether the COVID was a natural event or not, there is nothing in the complaint to put aside the plain language. Let's look at the complaint. There is nothing in the complaint that says COVID is not natural. There is nothing in the complaint that says COVID is not a disaster. There are no factual allegations in the record to support that. Likewise, with respect to the 20th century contemporary evening auction being in New York, the plain language of Section 6a is merely a judgment. It says in New York. It doesn't say in New York. But it says currently scheduled. Currently scheduled, May 2020. That's with respect to date. This was a big deal in the art world, I gather, that twice a year they had this big event that was an in-person auction. That's correct, Your Honor. And so the parties were bargaining for the auctioning of the painting at this in-person, semiannual, special auction that was going to be held in May of 2020. That's correct, Your Honor. And two things. When you look at the complaint, you will not find a single allegation in the complaint that says that auction was bargained for an online auction. And how do you deal with the argument that, well, they could have done this online? Your Honor, this is a question of alternate performance. Number one, the auction bargained for was this very specific auction, the 20th century contemporary art evening auction in New York. That is the auction they bargained for. They didn't bargain for a different auction. They didn't bargain for an online auction conducted live-streamed from London with people being all over the world. They bargained for this specific auction. And the case law is clear that if you bargain for a specific thing, whether it's lumber from a specific source, or whether it's delivery by train instead of by truck, as some of the cases we cited on the page from the Bible are, then you get that in a proportionate majeure comes into play that prevents that from happening, as it did here on the 12th day, then you don't have to deliver different performance than what was bargained for. And when you look at the complaint, what's clear is they did not allege that this auction was an online auction. They did not allege that this auction has ever been conducted in its history as an online auction. And they didn't allege any facts whatsoever that would give a basis to conclude that that's what the parties bargained for. If I may just conclude a thought on that issue. The complaint doesn't give any basis. They cite three calendars. That's A220, A223, and A330 in the record that post-dated the pandemic start. That was nearly a year after the parties bargained for this specific auction. And they said, look at that. This is evidence of the parties' intent. But number one, plain language doesn't allow you to get there. That's parole evidence that is outside the plain language of Section 6A. And that evidence is well after the actual calendar that was posted at A877, where it's clear that all the online auctions are designated online and all the in-person are designated in-person. That's what they bargained for. There's nothing in the complaint that contradicts that. You could have, of course, sold the painting in the July auction, couldn't you have? There is no obstacle, alleged in the complaint or otherwise, that we were or were not able to do it. But that's not a legally relevant issue. Well, mitigating damages. Didn't you have any obligation to perform the best you could? Your Honor, the Section 12A termination clause allows determining an outliability period full stop. And the whole point of enforcing court provisions, as the clerk has said, is to limit the damages when a specific event that the parties bargained for gives rise to a postponement or the right to terminate. And so once 12A was satisfied, and it was by its express language, there was zero obligation to auction. And there was no breach by terminating. And when there's no breach from the termination, then there are no damages to mitigate. Well, I mean, I think I understand your argument to be that whatever obligation there might be in the abstract, when parties specifically agree that there will be a right to terminate, then there's no breach to mitigate the damages from. Is that right? I mean, it's not, we can't talk about whether your adversary suffered as a result of this decision that you made. It's whether or not the contract gave you the right to do it. OK. Thank you, counsel. Thank you very much. Mr. Zwer, you have reserved three minutes for rebuttal. Yes, Your Honor. I'd like to address the court's holding that it cannot be seriously disputed that the COVID-19 pandemic is a natural disaster. It's impossible to determine right now, especially without any scientific or expert testimony, whether the COVID-19 pandemic was a natural disaster, whether COVID-19 emanated from a leak in a Wuhan laboratory or was the result of human contact with an infected animal. I understand that argument, but that's just one of the grounds for Section 12 termination. It's the general obligation that it be a circumstance beyond your reasonable control. And many of the other circumstances that are specifically identified as beyond reasonable control are man-made. General strikes, war, armed conflict, even fires. I mean, not all fires are caused by a lightning strike. Some are caused by human carelessness. So I don't see that, you know, whether the pandemic is humanly caused, as very helpful to us. What's your larger argument about why this isn't a matter beyond their control? Because that's the general requirement. Our larger argument is that, as set forth in Kel Kamenetz's progeny, general caps-off phrases are construed narrowly and concern only events of the same kind or nature as the events enumerated in the force majeure clause. Would you think there's more control over a pandemic than over a strike? I don't think that, in negotiating the terms of the contract, the parties ever would have deemed a strike to be anything similar to a pandemic, a virus, or a disease. Well, in terms of it being within someone's control. But I think that... I'm having difficulty understanding why you think this doesn't come into our circumstances beyond their reasonable control. Because I believe that general catch-all phrase is limited by the specific enumerated defense. But that's including without limitation. So I don't think you can argue that. It specifically says it's not, that these are illustrative, not exclusive. I would argue that, in terms of foreseeability, also, the parties could very easily have included virus, pandemic, or disease in this provision having intended for those events to be... Well, do you agree that the postponement here was because of circumstances beyond the party's control? I believe that the postponement of a physical in-person auction in New York was as a result of events beyond the party's control. But I believe that, alternatively performing, as Phillips did by conducting a July 2nd London auction, that it called it Spring 2020. So if we disagree with you on your reading of the description of the in-person auction, of the auction in New York in Spring of 2020, then you would agree that the postponement was because of circumstances beyond the party's control. In other words, if we conclude that the contract clearly says the in-person Spring 2020 auction, then it seems to me you would have to concede that the postponement was because of the pandemic was for reasons beyond the party's control. If it was limited to in that one very specific narrow reading of the contract, then yes. But if I can address that point very quickly, I think opposing counsel mischaracterizes the agreement. He said that it says the auction shall be held in New York. That's not what the agreement actually says. It says the property shall be offered... Do you disagree that the point of this contract, what the parties bargained for, what they wanted, was to auction the painting at this big semiannual auction that was held in the Spring of 2020 in New York? I mean, this was a big deal, as I understand it. I partially agree with that, Your Honor. I think absolutely... I mean, the parties were not bargaining for an auction at any time that was convenient, whether it was in person or online. That's not what the parties envisioned, right? Your Honor, what I want to make very clear, what the parties envisioned, the whole purpose of the contract, was that this work would be auctioned in the major 20th century and contemporary art auction. Jan did not care whether that auction would be held in May 2020. That's why there is a contract provision stating that Phillips could actually conduct the auction later, sell the stingle on a later date. Jan didn't care whether it was physically... If you consented, right? If... Yes. Yes. So the agreement was May 2020, subject to the mutual agreement of the parties. It said, currently, May 2020, isn't it? Yes, Your Honor. And aren't these factual issues? Yes, exactly. Aren't these factual issues that don't lend themselves to a decision on the 12B6 basis? I think they are, Your Honor. Enumerate the factual issues for me now. Okay. One factual issue is how Phillips typically conducts these auctions. There are always large virtual components, absentee bids, phone bids. Being physically present at an auction, including the way this auction is typically held, which is a question of fact, are also questions of fact. And how would that... And what part of the contract does that illuminate? That illuminates the critical question of fact here, which is in 6A, when it said... When it says that the property shall be offered for sale in New York in our major spring 2020 evening auction of 20th century contemporary art, currently scheduled for May 2020, what exactly did that mean? What was the party's intent? What are you saying it means that would be favorable to you? I just want to know what the plausible allegation is that would support your claim here. So what do you think the facts are going to show that would be helpful to you? It's twofold. One is that when it says offered for sale in New York, that Phillips believes that a work can be offered for sale in New York, even if there is not a physical presence in New York. Even if the work is not sold at a physical brick-and-mortar location in New York, including, as it was in this case, in July 2nd, a virtual auction with the auctioneer physically located in London being live-streamed in New York, and so New Yorkers can bid on and purchase the work. But wouldn't the facts that would have to be examined be the facts as of the time of contract formation? So is it your expectation that you're going to be able to elicit facts that show that Phillips ever conducted its spring auction other than live and in person? Yes, that's absolutely one of the factual inquiries. But do you have a good faith basis for thinking that you're going to be able to develop evidence that they didn't? I think we have a good faith basis to develop evidence that Phillips' major spring 2020 auction of 20th century and contemporary art is not always conducted in one uniform manner, that in fact that is... Before or after this contract was formed? Before, Your Honor. This isn't the first major event. I know, okay. Well, do you have reason to think they didn't do that? Because, you know, as we said, this is a famous auction in the art world, purportedly. Were you able to plead that, you know, three years before they did it in some other manner? Your Honor, we weren't required to plead that at this stage. We need to develop those facts. Well, you're telling us that this is a question of fact. And I'm trying to understand how you've plausibly pled that the words mean anything other than what they say. And you say based on practice, but you didn't plead that there was a different practice. Well, Your Honor, we saw a discovery on this point, and we made clear in our papers that we were going to further develop this point and that we believe, you know, upon information... What other factual issues in your mind argue against a 12b6 holding? Other factual issues concern whether it had to be conducted at a specific fiscal location, whether it had to be conducted May 2020, the intent of the parties with respect to the interrelatedness of the agreement, specific factual allegations that we made underpinning our good faith and fair dealing claim, including statements made to Jan by Phillips personnel about whether contracts would be upheld and honored and about when exactly the single work would be auctioned in subsequent auctions. Other continuous contracts, for instance, maybe Phillips used different terminology clarifying exactly what they mean when they say our major spring 2020 evening auction of 20th century contemporary art and the terms that permitted Phillips to terminate or decide not to terminate in those instances, whether COVID-19 is a natural disaster. And critically, I want to note the internal discussion that Phillips had when it made the decision to reschedule and postpone the auction and how exactly they determined where to hold the auction, whether that would still be deemed a New York auction, whether that would run counter to any contract provisions requiring the auction of works in New York, expert discovery about the pandemic. Thank you. I'm looking at a contract that says the property shall be offered, shall is understood as mandatory language in New York. So I'm not sure how you have an argument that the expectation is any place other than New York. In our major spring 2020 evening auction, so that says when and where. It tells us it's currently scheduled for May 2020. It reserves to Phillips the right in its sole discretion to select, change or reschedule the date, time, place and time. But if that change is any later date than May 2020, you have to give consent, which you could presumably refuse. So there's no binding agreement for anything other than that. But you were never asked for consent, were you? No, we were not, Your Honour. I'm sorry. I said you were never asked for consent. Right, right. But my point is, what is uncertain about the agreement being New York in the spring 2020, in the evening, no later than May 2020? That's the agreement, barring any subsequent change by the parties, isn't it? Yes, but the first question for me, Your Honour, is, shall be offered for sale in New York? What does it mean to be offered for sale in New York? And Phillips, in fact, cites a case that destroys their argument. Digital equipment, where the court held that the internet has no territorial boundaries. When business is transacted over a computer network via a website, accessed by a computer in Massachusetts, it takes place as much in Massachusetts, literally or figuratively, as it does anywhere. JAN maintains that the replacement version of this auction, the one that was conducted in July 2, 2020, was an auction in which the single could be offered for sale in New York. OK, I understand that argument. Thank you. I understand. Do you have any other factual issues you want to put before us before we close the argument? Can I have just 20 seconds to... You can have 10 seconds. Thank you. Yes, the one thing I just want to reference is a Second Circuit case cited by the court, MPM Silicones, where it says an ambiguity exists where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business. Those are factual issues that we want to develop. Customs, practices, usages, and terminology with respect to determining what exactly is the major Spring 2020 evening auction, what are the virtual components of that auction, can it be held virtually, when does it have to be held, where does it have to be held. Thank you. Thank you both for lively arguments for reserved decisions.